UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAISHA EMMANUEL, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFF,<br><br>v.<br><br>HANDY TECHNOLOGIES, INC.,<br><br>DEFENDANT. | CIVIL ACTION NO. 1:15-CV-12914-NMG<br><br>**LEAVE TO FILE GRANTED 9/2/15** |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO COMPEL ARBITRATION AND DISMISS**

**INTRODUCTION**

Plaintiff responds to Handy's motion to compel arbitration with the legal equivalent of the "dog ate my homework" excuse. Thus, Plaintiff offers a series of mutually inconsistent contentions—*i.e.*, that she never had access to the arbitration agreements at issue; that even if she did have access, she never accepted them; or that even if she did accept them, she could not read them—all of which are plainly not true given the unequivocal documentary record. She also argues that the arbitration clause with Handy was unconscionable, despite the fact that she does not come close to meeting the very high standard for unconscionability under Massachusetts law. Even worse, in order to buttress her ill-conceived arguments, Plaintiff's counsel attaches to her papers documents from a private arbitration between two entirely separate, unrelated parties, in what appears to be a violation not only of her other client's confidentiality obligations under that contract, but her ethical obligations as an attorney.

For example, Plaintiff insists that Handy's Terms of Use are the only operative agreement between the parties, even though only days after accepting the Terms of Use, she agreed to two Service Professional Agreements containing arbitration provisions that expressly supersede the provision contained in the original Terms of Use, and all of the work she did for Handy customers was performed *after* she accepted the initial Service Professional Agreement. Similarly, although Plaintiff claims that she does not recall ever assenting to the Service Professional Agreements, Handy has provided the Court with electronic records that clearly prove that she did. Indeed, Plaintiff actually could not have used Handy's "app" to connect with customers, perform work, and get paid for it, had she not accepted the Service Professional Agreements—there is no way for someone to bypass the blocking screen in Handy's software other than by clicking "Accept."

As for Plaintiff's argument that she somehow could not see the arbitration clause because, she asserts, it was "buried in a lengthy document that was presented on a tiny smartphone screen" (Plf.'s Opp. Br. at 2), the Service Professional Agreements' terms were set forth in large font and scrollable text on the same screen as the Service Professional Agreements' acceptance/confirmation box, which Plaintiff had no difficulty clicking. And the arbitration clause is not hidden in some obscure corner of the document; it is contained in its own separate section with a bolded heading that would catch anyone's attention. Massachusetts law is clear that such "click-wrap" agreements are binding on the parties and for good reason—to rule otherwise would wreak havoc on large segments of today's economy where business is routinely conducted and agreements are regularly entered into on smartphones. *See, e.g., Ajemian v. Yahoo!, Inc.*, 987 N.E.2d 604, 613 (Mass. App. Ct. 2013); *Pazol v. Tough Mudder, Inc.*, --- F.

2

Supp. 3d ---, 2015 WL 1815685, at *2 (D. Mass. 2015); *Hughes v. McMenamon*, 204 F. Supp. 2d 178, 181 (D. Mass. 2002).

Presumably aware that the arbitration agreement is enforceable, Plaintiff retreats to the position that it is somehow unconscionable. Plaintiff points to other provisions in the Terms of Use, which is not the operative agreement in any event, regarding cost-sharing and unilateral modification that she contends somehow make the agreement to arbitrate unconscionable. Those provisions are not unconscionable; in fact, the agreements and applicable AAA rules leave open the possibility that Handy will pay the costs of arbitration if Plaintiff cannot afford them and Handy is willing to do so here. But even if the provisions were unconscionable (and they are not), the appropriate remedy here would be to sever them, leaving the Plaintiff's obligation to arbitrate fully intact and enforceable. More importantly, Plaintiff identifies no provision of the operative Service Professional Agreement that is unconscionable, nor could she, since each of the provisions Plaintiff identifies as being unconscionable are absent from that agreement. By failing to address the operative agreement, Plaintiff effectively concedes it is enforceable.

Handy's motion should be granted.

## ARGUMENT

### A. The Service Professional Agreements Are the Operative Agreements

Plaintiff agreed to arbitrate any disputes relating to her relationship with Handy on three separate occasions. Specifically, on May 5, 2015, she accepted Handy's Terms of Use (the "Terms of Use"). (Declaration of Nick Patrick at ¶¶ 5-6 (Dkt. No. 9-1 (the "Patrick Decl."))); Patrick Decl. Exhs. A, B & C.) Only nine days later, on May 14, 2015, she accepted Handy's Service Professional Agreement/Independent Contractor Agreement (the "Service Professional Agreement"). (Patrick Decl. at ¶¶ 8-9; Patrick Decl. Exhs. D, E & F.) Finally, when Plaintiff accessed the Handy app three weeks later, on June 4, 2015, she accepted an updated version of

the Service Professional Agreement (together with the Terms of Use, the "Handy Agreements"). (Patrick Decl. at ¶¶ 10-11; Patrick Decl. Exhs. G, H, I & J.)

Black letter principles of contract law dictate that the Service Professional Agreement, and not the Terms of Use, is the operative contract for purposes of Handy's Motion to Compel. Where parties enter into successive agreements covering the same subject matter, the subsequent contract "is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." Restatement (First) of Contracts, § 408; *see also, e.g.*, *De Blois v. Boylston & Tremont Corp.*, 183 N.E. 823, 827 (Mass. 1933). Indeed, Handy's Service Professional Agreement states that it "constitutes the sole and entire agreement of the parties . . . with respect to the subject matter contained here, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter." (Service Professional Agreement § 15.) The Service Professional Agreement also expressly states that "To the extent the Terms of Use are inconsistent with this Agreement, this Agreement shall control." (*Id.* § 1.2).

To be clear, *all* of the work that Plaintiff did in connection with Handy was necessarily performed *after* she signed the first Service Professional Agreement on May 14.[1] Plaintiff could not have accepted jobs from Handy customers or have been paid for them without first accepting the Service Professional Agreements. (Patrick Decl. at ¶¶ 7-9; Declaration of Kenneth Little, filed herewith (the "Little Decl.") at ¶¶ 5-7.)

---

[1] Although Plaintiff seeks to avoid the June 4, 2015 Service Professional Agreement by arguing that she "had stopped working for Handy" by that date, Plaintiff took no action to end her independent contractor relationship with Handy and remained eligible to use Handy's app after doing so. Moreover, Plaintiff does not similarly challenge the May 14, 2015 Service Professional Agreement, which is identical to the June 4, 2015 Service Professional Agreement in all relevant respects.

4

### B. Plaintiff Accepted the Handy Agreements

The Service Professional Agreement was presented to Plaintiff on May 14, 2015 on a screen that included both a display of its terms in scrollable text and an "Accept" box that Plaintiff had to and did in fact click in order to proceed to use Handy's app to connect with customers and accept jobs. While Plaintiff attempts to avoid arbitration by denying that she clicked "Accept," she fails to explain how she could possibly have done so by bypassing Handy's blocking screen.[2] This is hardly surprising. The whole purpose of the blocking screen was to make it impossible for Plaintiff (or anyone else for that matter) to do so. By design, the only way technologically to move past the blocking screen and begin using the Handy app is by clicking "Accept." (Patrick Decl. at ¶¶ 7-12; Little Decl. at ¶¶ 5-8.) Plaintiff does not (and cannot) contend otherwise.

Plaintiff further contends that the Service Professional Agreement is somehow not enforceable because she chose to view it on "a tiny iPhone screen." (Plf.'s Opp. Br. at 2, 6, 8.) In fact, the Service Professional Agreement was presented in large font in a clear and easily readable manner made possible by her iPhone's scrolling feature. (*See* Patrick Decl. Exhs. D, E, G & I.) Plaintiff provides no explanation as to why she would have had any difficulty reading such text. If she is farsighted or otherwise has difficulty seeing, she presumably has glasses or some other way to read text on computer screens unrelated to Handy or the Handy Agreements at issue. She also does not contend that she lacked ample time to review the Service Professional Agreements, nor that the arbitration provision was presented in a way that made it more difficult

---

[2] Although Plaintiff suggests that she needed to click "Accept" before she could review the Service Professional Agreements' terms, that is not correct. (*See* Plf.'s Opp. Br. at 9 n.11.) In fact, the terms were on the same page as the "Accept" button, and Plaintiff was able to view them before clicking "Accept." (Little Decl., ¶ 7.)

to read than the other terms contained in the Service Professional Agreement. Plaintiff therefore cannot avoid her assent to the arbitration provision.

        C.        <u>**The Handy Agreements Are Enforceable**</u>

Massachusetts law is clear: "In the absence of fraud, a person who signs a written agreement is bound by its terms whether she reads and understands them or not." *DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 115 (D. Mass. 2001). Even Plaintiff concedes that this type of agreement is valid. More specifically, while she cites *Ajemian v. Yahoo!, Inc.* (Plf.'s Opp. Br., at 2-3, 8) for the proposition that there is a stringent standard for companies seeking to bind individuals via electronic links, *Ajemian* explicitly approved click-wrap agreements where, as here, "the terms of the agreement were displayed, at least in part, on the user's [] screen and the user was required to signify his or her assent by 'clicking' 'I accept.'" 987 N.E.2d at 613.

Handy has submitted to the Court electronic records, the validity of which are not challenged by Plaintiff, showing the times and dates on which Plaintiff accepted the Agreements. (Patrick Decl. Exh. K.) These records would not exist had Plaintiff not clicked the "Accept" button. (Little Decl. at ¶¶ 4, 10.) Handy has therefore satisfied its burden under *Ajemian* by producing unequivocal evidence, including documentary support, illustrating how notice of the contractual terms was provided to and accepted by Plaintiff. Recognizing the imperfections of memory (or less charitably, the incentive to self-servingly claim that one does not remember), courts across the country routinely enforce agreements under similar circumstances. *See, e.g.*, *Tompkins v. 23andMe, Inc.*, No. 13 Civ. 5682, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014); *Merkin v. Vonage Am. Inc.*, No. 13 Civ. 8026, 2014 WL 457942, at *3 (C.D. Cal. Feb. 3, 2014); *Martyn v. J.W. Korth & Co.*, No. 111 Civ. 407, 2011 WL 2144618, at *3 (W.D. Mich. June 1, 2011); *Polly v. Affiliated Computer Servs., Inc.*, No. 10 Civ. 135, 2011 WL 93715, at *3

(E.D. Ky. Jan. 11, 2011); *Eslworldwide.com, Inc. v. Interland, Inc.*, No. 06 Civ. 2503, 2006 WL 1716881, at *2 (S.D.N.Y. June 21, 2006).

Indeed, a court has already ruled that a plaintiff suing Handy should be forced to arbitrate their claims against Handy based only on Handy's Terms of Use. In *Zenelaj v. Handybook, Inc.*, -- F. Supp. 3d ---, 2015 WL 971320 (N.D. Cal. 2015), two of Handy's independent contractors brought a putative class action lawsuit alleging violations of California employment law. After Handy removed the suit to federal court, it moved to compel arbitration. The *Zenelaj* court granted Handy's motion, finding the Terms of Use's class-action waiver was valid and that, under the Terms of Use's delegation clause, it would be left to the arbitrator to interpret Handy's arbitration clause and how it applied to the claims in that case. Accordingly, the contractors' "class claims [were] stayed pending a decision on arbitrability by the arbitrator." *Id.* at 6.[3]

Moreover, even if Plaintiff were a secret computer hacker who somehow figured out how to bypass Handy's blocking screen without clicking "Accept" pursuant to the Service Professional Agreements, she nevertheless concedes that she was presented with the Service Professional Agreement dictating the terms of her relationship with Handy before proceeding to use Handy's app to connect with customers. (Emmanuel Aff. at ¶ 5 (Dkt. No. 24-1).) Having had the opportunity to review the contractual terms and availed herself of the benefits of her relationship with Handy, Plaintiff was still bound by the Service Professional Agreements' terms, regardless of whether she affirmatively clicked "Accept," because in such circumstances her subsequent use of the app establishes assent. *See Ellerbee v. GameStop, Inc.*, 604 F. Supp.

---

[3] Moreover, although, as discussed below, Plaintiff attacks the validity of the Terms of Use's delegation clause (Plf.'s Opp. Br. at 9-11), she does not identify any fault with the decision in *Zenelaj* upholding and enforcing that provision. Regardless, the Service Professional Agreements—which govern this dispute—do not contain any such clause.

2d 349, 354-55 (D. Mass. 2009); *see also, e.g.*, *Feroce v. Bloomingdale's Inc.*, No. 12 Civ. 5014, 2014 WL 294199, at *6 (E.D.N.Y. Jan. 24, 2014).

In this regard, Plaintiff fails to point to any authority supporting her position. The case of *Mohamed v. Uber Technologies, Inc.*, --- F. Supp. 3d ---, 2015 WL 3749716 (N.D. Cal. 2015) ("*Uber*"), upon which Plaintiff relies (Plf.'s Opp. Br. at 10-15), is not to the contrary. In finding that the *Uber* plaintiffs had assented to be bound by Uber's arbitration provision under California law, *Uber* held that Plaintiff's argument "misses the mark" because, "for the purposes of contract *formation*, it is essentially irrelevant whether a party actually reads the contract or not, so long as the individual had a legitimate *opportunity* to review it." *Id.* at *7; *see also CSX Transp., Inc. v. ABC & D Recycling, Inc.*, No. 11 Civ. 30268, 2013 WL 3070770, at *4 (D. Mass. June 14, 2013) (same). Plaintiff does not contest that she had the opportunity to review the Service Professional Agreement here. (*See* Little Decl. at ¶¶ 5-9.)

Plaintiff's reliance on *Acher v. Fujitsu Network Commc'ns, Inc.,* 354 F. Supp. 2d 26 (D. Mass. 2005) (Plf.'s Opp. Br. at 5, 8), is similarly misplaced. In that case, the movant claimed to have sent a copy of the arbitration policy to all employees eight years earlier, but there was no documentary or other evidence that the plaintiff in that case had actually received—or even been notified of—the policy. In contrast, even Plaintiff does not dispute that she was presented with both the Terms of Use and Service Professional Agreements, and Handy has provided the Court a record of her acceptance. While Plaintiff also cites *Skirchak v. Dynamics Research Corp.*, 432 F. Supp. 2d 175 (D. Mass. 2006), *aff'd*, 508 F.3d 49 (1st Cir. 2007), and *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546 (1st Cir. 2005) (Plf.'s Opp. Br. at 7), both of those cases similarly involved contractual provisions contained in attachments to emails sent to employees where there was no proof that the employees were made aware of the attachments'

8

contents or opened them. Such logic does not apply to the click wrap agreements at issue here, which, by their nature, provide notice of the existence of contractual terms and give the party the opportunity to review such terms before affirmatively accepting them. *See, e.g.*, *Ajemian*, 987 N.E.2d at 613.

### D. The Handy Agreements Are Not Unconscionable

The legal standard for contractual unconscionability under Massachusetts law is extremely high. In order for an agreement to be found to be unconscionable, the contract must be "such as no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Storie v. Household Int'l, Inc.*, No. 03 Civ. 40268, 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005) (quoting *Waters v. Min Ltd.*, 412 Mass. 64, 66 (1992)). Plaintiff falls far short of meeting this stringent standard here.

#### 1. Procedural Unconscionability

First, Plaintiff argues that the Service Professional Agreements are procedurally unconscionable because they are contracts of adhesion. But the mere fact that a contract is one of adhesion "does not make the terms at issue unenforceable." *Pazol*, 2015 WL 1815685, at *2. Indeed, the United States Supreme Court firmly rejected this argument in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593 (1991), when it reversed a circuit court's determination that "a nonnegotiated forum-selection clause in a form . . . contract is never enforceable simply because it is not the subject of bargaining."

Plaintiff next contends that the Service Professional Agreements' arbitration provision was "buried" in a lengthy contract. In fact, however, the provision appears halfway through the Service Professional Agreements, is set forth in standard font, and is clearly labeled with underlined headings. Moreover, language contained within the arbitration provision in the Service Professional Agreement urged Plaintiff to "**PLEASE READ**" that section. (Service

Professional Agreement § 12.2(b) (emphasis in original).) Thus, even if Plaintiff had casually scrolled through the Service Professional Agreements, she would have had reasonable notice of the arbitration provision. *See, e.g.*, *Kilgore v. KeyBank Nat'l Ass'n*, 718 F.3d 1052, 1059 (9th Cir 2013); *Carter's of New Bedford, Inc. v. Nike, Inc.*, 13 Civ. 11513, 2014 WL 1311750, at *4 (D. Mass. Mar. 31, 2014); *Allied Home Mortg. Capital Corp. v. Grant*, No. 040505B, 2005 WL 3721194, at *5 n.5 (Mass. Sup. Ct. Dec. 6, 2005); *Winter Panel Corp. v. Reichhold Chems., Inc.*, 823 F. Supp. 963, 973 (D. Mass. 1993).

The fact that the Service Professional Agreement was presented to Plaintiff on her iPhone also does not support a finding of unconscionability. Agreements on smartphones are commonplace in today's society, as smartphones are a primary (if not the primary) means of communication for many people. To rule, as Plaintiff suggests, that entering into a commercial agreement on a smartphone is unconscionable *per se* would effectively invalidate all such agreements, thereby causing enormous harm to large segments of the United States economy. *Cf. United States v. Saboonchi*, 990 F. Supp. 2d 536, 556 (D. Md. 2014) ("Over ninety percent of American adults own some kind of cellular phone and more than half of those own a smart phone."); *Dow v. Casale*, No. SUCV201001343BLS1, 2011 WL 6379286, at *4 n.11 (Mass. Sup. Ct. July 19, 2011) ("in this age of the ubiquitous Blackberry, iPad and smartphone, any person can work in any location that has internet access.")

Plaintiff's contention that the arbitration provision in the Terms of Use was "buried" in a lengthy contract fares no better. The phrase "Terms of Use" was referenced on Plaintiff's screen, highlighted in blue to call attention to it, and provided a hyperlink to the full text of the Terms of Use. The arbitration provision in the Terms of Use was again conspicuously labeled, set forth in standard font, and included bolded and underlined section headings. *Kilgore*, 718

F.3d at 1059; *Carters's of New Bedford*, 2014 WL 1311750, at *4; *Grant*, 2005 WL 3721194, at *4; *Winter Panel*, 823 F. Supp. at 973. As Plaintiff herself admits that she filled out the application (Emmanuel Aff.at ¶ 4), it is simply inconceivable that she would not have seen the reference to the Terms of Use. Indeed, there is no dispute that Plaintiff checked the box labeled "I agree to Handy's Terms of Use." (Patrick Decl. at ¶ 4.) Courts have consistently found that contracts entered into in this manner are valid and enforceable. *See, e.g.*, *Bagg v. HighBeam Research, Inc.,* 862 F. Supp. 2d 41, 43, 45 (D. Mass. 2012); *i.LAN Sys., Inc. v. Netscout Serv. Level Corp.*, 183 F. Supp. 2d 328, 338 (D. Mass. 2002).

Likewise, Plaintiff's contention that no agreement was entered into because she does not "recall" confirming acceptance of the Terms of Use (Emmanuel Aff. at ¶ 4) has no legal support here, where Handy has produced an electronic record showing that she did in fact do so. In similar circumstances, courts have not hesitated to reject assertions that a contract was not valid. *See, e.g.*, *Tompkins*, 2014 WL 2903752, at *8; *Merkin*, 2014 WL 457942, at *3; *Martyn*, 2011 WL 2144618, at *3; *Polly*, 2011 WL 93715, at *3; *Eslworldwide.com*, 2006 WL 1716881, at *2.

### 2. Substantive Unconscionability

Plaintiff further argues that the Service Professional Agreements are substantively unconscionable because they contain a cost-splitting provision that could require Plaintiff to pay a fee to initiate arbitration. (Plf.'s Opp. Br. at 12.) But the Service Professional Agreements do not require her to pay significant fees at the outset of arbitration. Rather, the Service Professional Agreements stipulate that "payment of the Arbitrator's fees and costs will be determined by the arbitrator in accordance with applicable law, unless the parties agree otherwise in writing." (Service Professional Agreement § 12.2(d)(2).) This provision, by its clear terms, necessarily ensures that filing and administrative fees may not be "so high as to make access to the forum impracticable," rendering the provision lawful under controlling Supreme Court

precedent. *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2317 (2013). The relevant AAA rules, in turn, only reinforce this point. They make it clear that "The AAA, may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees" that must be paid. *Commercial Arbitration Rules and Mediation Procedures* at 29, American Arbitration Association, *available at* https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103.

Because Plaintiff has never asked—and the parties therefore have not even discussed—whether Handy would consider paying Plaintiff's portion of the filing fees, the argument that arbitration is prohibitively expensive and that inclusion of that provision in the contract makes the agreement to arbitrate unconscionable lacks merit. Indeed, Handy hereby represents to Plaintiff and this Court that it would, in fact, agree to cover the costs of either mediation or arbitration, as both the Service Professional Agreement and the AAA Commercial Arbitration Rules contemplate and permit.

To bolster her argument, Plaintiff seeks to introduce evidence regarding an unrelated arbitration dispute, *Ribiero v. System 4 LLC*, AAA No. 01 15 0003 8637, whose only connection to this case is the involvement of Plaintiff's counsel, Shannon Liss-Riordan. Because *Ribiero* involves different parties, facts, and legal issues, it is entirely irrelevant. There is no suggestion that either a court or arbitrator ever addressed the issue of whether the parties had entered into a binding agreement to arbitrate in *Ribiero*, which is the only issue currently before this Court.

Moreover, the very filing of documents from *Ribiero* in this action is very likely improper pursuant to Ms. Liss-Riordan's ethical obligations to this Court and to her clients. The Massachusetts Rules of Professional Conduct, which are expressly incorporated into this Court's local rules, *see* Local Rule 83.6.1(a), make clear that an attorney "shall not reveal confidential

information relating to representation of a client unless the client consents after consultation." Mass. R. of Prof. Conduct 1.6(a). Yet there is no suggestion that Mr. Ribiero has agreed to allow documents from his dispute with System 4 to be used for the benefit of Plaintiff here. And if he had, such use would have violated his agreement with System 4, which clearly states that no documents from "any arbitration proceeding conducted [t]hereunder"—such as *Ribiero v. System 4 LLC* itself—"may be introduced, referred to or used in any subsequent or other proceeding as a precedent . . . or for any other purpose whatsoever." (Dkt. No. 24-2 at § 19(B).) In other words, either (i) Ms. Liss-Riordan has violated the Rules of Professional Conduct by acting without Mr. Ribiero's consent, or (ii) Ms. Liss-Riordan has caused Mr. Ribiero to breach his contract. Regardless of which occurred, such behavior should not be countenanced and Handy therefore strenuously urges the Court to disregard all references to *Ribiero* in Plaintiff's filings.

But even if the Service Professional Agreements did require Plaintiff to pay her share of any subsequent arbitration fees, Plaintiff would still have failed to carry her burden of demonstrating "the *actual costs and fees* to which she would be subject in arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 n.6 (2000) (emphasis added). As the Supreme Court has made clear, "[t]he 'risk' that [a party] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91. Nor is the *Uber* case to the contrary because California law, unlike Massachusetts law, clearly prohibits an employer from requiring an employee "to bear any *type* of expense" that she would not have encountered in court. [4] 2015 WL 3749716, at *27 (emphasis in original). Indeed, in a case

---

[4] Plaintiff's reliance on *Uber*'s unconscionability findings are inapposite because they were based on California contract law that has no bearing here. Indeed, the *Uber* court acknowledged as much in the related case of *Gillette v. Uber Technologies*, 2015 WL 4481706, at *5-6 (N.D. Cal. July 22, 2015), in which it refused to consider decisions on unconscionability from other states because their laws differed from California's. Notably, the California judiciary's unique hostility to arbitration has drawn the ire of the Supreme Court of the United States. *See Concepcion v. AT&T,* 563 U.S. 333 (2011) ("The judicial

similar to this one, the Massachusetts Supreme Judicial Court recently held that cost sharing provisions are allowed in arbitration agreements covering employment disputes and are not unconscionable because employment laws allow a prevailing plaintiff to recover attorneys' fees and costs. *Machado v. Sys. 4 LLC*, 471 Mass. 204 (2015). And Plaintiff's argument that the fee-splitting provision is substantively unconscionable certainly does not apply to the Terms of Use because they provide that "Handy will pay all arbitration fees and expenses" if its counterparty cannot afford them. (Terms of Use § 16(b).)

While Plaintiff also points to the existence of a unilateral modification clause as evidence of unconscionability (Plf.'s Opp. Br. at 14), no such clause appears in the Service Professional Agreements. Rather, the Service Professional Agreements expressly provide that they "may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto." (Service Professional Agreement § 15.) Likewise, the Service Professional Agreements do not contain the one-sided "carve out provision" of which Plaintiff complains. (Plf.'s Opp. Br. at 14.) To the contrary, they cover "any and all claims relating to this Agreement, the Service Professional's Classification as an independent contractor, Service Professional's provision of Services under this Agreement, and all other aspects of the Service Professional's relationship with Handy, past or present, whether arising under federal, state or local statutory and/or common law." (Service Professional Agreement § 12.2.)

As for the Terms of Use, the exclusion from arbitration of certain claims, such as intellectual property claims that Handy is more likely to bring against contractors, does not make the agreement substantively unconscionable as a matter of law because they are mutual. *See e.g.*,

---

hostility towards arbitration that prompted the FAA had manifested itself in a great variety of devices and formulas declaring arbitration against public policy. And . . . it is worth noting that California's courts have been more likely to hold contracts to arbitrate unconscionable than other contracts.")

*Tompkins*, 2014 WL 2903752, at *17; *see also NetNumina Solutions, Inc. v. DietRehab.com, Inc.*, No. 01 Civ. 10195, 2001 WL 455842, at *8 (D. Mass. Apr. 6, 2001). And the existence of a unilateral modification clause in a contract, standing alone, is not sufficient to invalidate a contract containing an arbitration provision. *See, e.g.*, *Joule, Inc. v. Simmons*, No. SUCV200904929A, 2011 WL 7090714, at *4 (Mass. Sup. Ct. Dec. 5, 2011).

Even assuming *arguendo* that the Court were to find that either the Service Professional Agreements or Terms of Use contained substantively unconscionable provisions, the appropriate remedy would be to sever those provisions and enforce the remaining agreement. Indeed, the Service Professional Agreement itself expressly provides that "[i]n the event any portion of this dispute resolution provision is deemed unenforceable, the remainder of this dispute resolution provision will be unenforceable." (Service Professional Agreement § 12.2(h); *see also* Terms of Use § 16(f).) The authority Plaintiff cites does not advance her argument that severance would be improper. As a matter of basic contract law, striking the entirety of the agreement is only required where "illegality pervades the arbitration agreement such that only a disintegrated fragment would remain after hacking away the unenforceable parts . . . ." *Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 84-85 (D.C. Cir. 2005) (applying D.C. contract law). Here, the Handy Agreements are clearly not "pervaded with illegality" and severing any offending provision would certainly leave more than a "disintegrated fragment." Thus, severance would be the appropriate remedy and arbitration should still be compelled. *See Kristian v. Comcast Corp.*, 446 F.3d 25, 62-63 (1st Cir. 2006); *Anderson v. Comcast Corp.*, 500 F.3d 66, 77 (1st Cir. 2007); *Machado*, 471 Mass. at 220.

### E. The National Labor Relations Act Does Not Prohibit Enforcement of the Agreement.

Finally, Plaintiff argues that the Service Professional Agreement is somehow illegal because it purportedly violates Section 7 and 8(a)(1) of the National Labor Relations Act ("NLRA"). But the National Labor Relations Board's ("NLRB") decision in *D.R. Horton,* upon which Plaintiff relies (Plf.'s Opp. Br. at 17-18) was overturned by the United States Court of Appeals for the Fifth Circuit, which held that the "use of class procedures … is not a substantive right" and the NLRA does not trump the Federal Arbitration Act. *D.R. Horton, Inc.*, 37 F.3d 344, 357, 360-361 (5th Cir. 2013). Indeed, since the NLRB's decision in 2012, more than forty state and federal courts throughout the United States have rejected or refused to follow the Board's rationale. *See, e.g., Richards v. Ernst & Young, LLP,* 734 F.3d 871, 873-74, *opinion amended and superseded by* 744 F.3d 1072 (9th Cir. 2013) ("overwhelming majority" of courts "have determined that they should not defer to the NLRB's decision in *D.R. Horton* because it conflicts with the explicit pronouncements of the Supreme Court concerning the policies undergirding the Federal Arbitration Act"); *Sutherland v. Ernst & Young LLP,* 726 F.3d 290, 297-98 n. 8 (2nd Cir. 2013) (federal courts "owe no deference to [the NLRB's] reasoning" in *D.R. Horton*); *Owen v. Bristol Care, Inc.,* 702 F.3d 1050, 1054-555 (8th Cir. 2013) ("*D.R. Horton* carries little persuasive authority").

Although Plaintiff may contend that there is still life in *D.R. Horton* because of the NLRB's recent decision in *Murphy Oil USA Inc.*, 361 NLRB No. 72 (NLRB Oct. 28, 2014), the *Murphy Oil* majority simply recycles the same faulty reasoning underlying the *D.R. Horton* NLRB decision, which has received "near universal condemnation from the federal and state courts." *Murphy Oil,* 361 NLRB No. 72 at *35 (Johnson, Mem., dissenting). Given the Fifth Circuit's decision in *D.R. Horton*, it is only a matter of time before the Fifth Circuit follows its

own *D.R. Horton* precedent and similarly reverses the NLRB in the pending *Murphy Oil* appeal. *See Murphy Oil USA, Inc. v. NLRB*, No. 14-60800 (5th Cir., argued Aug. 31, 2015). Accordingly, there is simply no valid legal basis to argue that the NLRA precludes ordering Plaintiff to submit her claims to individual arbitration.

## CONCLUSION

Plaintiff agreed to arbitrate on an individual basis any and all claims arising from her contractual arrangement with Handy. Accordingly, Handy respectfully requests that the Court dismiss Plaintiff's class and collective action claims with prejudice and compel her to arbitrate her claims on an individual basis.

Respectfully submitted,

HANDY TECHNOLOGIES, INC.

By its attorneys,

/s/ Michael Mankes
Michael Mankes (BBO No. 662127)
Sarah E. Green (BBO No. 679732)
**LITTLER MENDELSON, P.C.**
One International Place, Suite 2700
Boston, MA 02110
Tel: 617.378.6000
Fax: 617.737.0052
mmankes@littler.com
sgreen@littler.com

Roberta A. Kaplan (BBO No. 559570)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Tel: 212.373.3086

September 2, 2015 — Fax: 212.492.0086

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 2nd day of September, 2015, a true and accurate copy of this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and sent via first class mail to unregistered participants.

                                                               /s/ Michael Mankes
                                                              Michael Mankes