UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAISHA EMMANUEL, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, )<br><br>PLAINTIFFS, )<br><br>v. )<br><br>HANDY TECHNOLOGIES, INC., )<br><br>DEFENDANT. ) | CIVIL ACTION NO. 1:15-cv-12914-NMG |

**DEFENDANT HANDY TECHNOLOGIES, INC.'S
POST-TRIAL PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

Defendant Handy Technologies, Inc. ("Handy" or "Defendant") respectfully submits its proposed findings of fact and rulings of law in connection with the bench trial held on February 10, 2020, and states as follows:

**PROPOSED FINDINGS OF FACT**

**I.     DEFENDANT HANDY TECHNOLOGIES, INC.**

1.      Handy provides a web-based "platform" that connects customers looking for home services with independent service professionals who provide various services, including but not limited to home cleaners, handy persons, painters and movers.  Trial Testimony of Kulesh Shanmugasundaram ("K.S. Test.").

2.      Handy offers its technology platform as a marketplace to connect service requesters with service providers and to facilitate payment between those parties.  Id.

3.      Throughout May and June of 2015, in order to use the Handy platform to connect with prospective customers, a candidate service professional ("Professional") would complete an

online application to register with Handy, undergo a background check, and attend an in-person orientation.  Id.  Assuming those steps have been completed successfully, the Professional would then use a smartphone to access the platform and connect with prospective customers through Handy's professional-facing smart-phone app (the "Handy App" or "App").  Id.

## II.   PLAINTIFF AGREED TO BE BOUND BY ARBITRATION AGREEMENTS COVERING THE INSTANT DISPUTE.

### A.   Plaintiff Agreed To Be Bound By An Arbitration Agreement When She Submitted Her Application To Handy.

4.   Plaintiff used a PC computer to fill out Handy's Home Cleaner Application (the "Application") on Handy's website in early May 2015.  Transcript of video Trial Testimony of Maisha Emmanuel conducted on January 9, 2020 ("Pl. Test.") at 10-11; see Exh. 6 (Screen shots of the Home Cleaner Application flow in use in May 2015).

5.   At that time, the Application contained sections entitled "Personal Details," "Work Experience," and "Other Info," which a Professional was required to fill out.  On the bottom of the Application screen the phrase "I agree to Handy's Terms of Use" appeared, accompanied by a checkbox.  See id.  The phrase "Terms of Use" appeared in blue to denote a hyperlink that, if clicked, allowed a Professional to view and scroll through the full text of Handy's Terms of Use. See Exhs. 6 & 7.  A Professional could not continue to the next screen and complete the application process without clicking the checkbox next to the phrase "I agree to Handy's Terms of Use."  K.S. Test.  Plaintiff stipulated at trial that, after filling out sections of the Application entitled "Personal Details," "Work Experience," and "Other Info," she clicked the checkbox next to the phrase "I agree to Handy's Terms of Use."  Thereafter, Plaintiff submitted her Application.

6.   Whenever a Professional submitted an Application, the Company was notified of the date and time the submission, and an electronic record of this information was generated automatically.  K.S. Test.  Handy stored, maintained, and relied on this electronic record in the

course of its business.  Id.  Handy's records showed that, on May 5, 2015, Plaintiff completed and submitted her Application.  See **Exhs. 8 & 9**.

7.      The Terms of Use contained a Mutual Arbitration Agreement, which was set off by bold, underlined font.  The Arbitration Provision in the Terms of Use reads in relevant part as follows:

### 16. **Mandatory Arbitration Agreement.**

a.  Informal Negotiations. To expedite resolution and reduce the cost of any e, controversy or claim, past, present, or future, between you and Handy, including without limitation any dispute or claim related to or arising out of this Agreement ("**Dispute**"), you and Handy may attempt to negotiate any Dispute informally (the "**Informal Negotiations**") before initiating any arbitration or court proceeding. Such Informal Negotiations will commence upon written notice.  Your address for any notices under this Section 16 is your email address and/or physical address that you have provided to Handy.   Handy's address for such notices is: legal@handy.com and/or by mail to Handy, Inc., Attn: Legal, 134 W 29th Street, 5th Floor, New York, NY 10001.

b.  Arbitration.  If a Dispute is not resolved through Information Negotiations, you and Handy agree to resolve any and all Disputes (except those Disputes expressly excluded below) through final and binding arbitration ("**Arbitration Agreement**"). This Arbitration Agreement shall be governed by the Federal Arbitration Act and evidences a transaction involving commerce.  The arbitration will be commenced and conducted before a single arbitrator under the Commercial Arbitration Rules (the "**AAA Rules**") of the American Arbitration Association ("**AAA**") and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ("**AAA Consumer Rules**"), both of which are available at the AAA website (www.adr.org).  Your arbitration fees and your share of arbitrator compensation will be governed by the AAA Rules (and, where appropriate, limited by the AAA Consumer Rules). If you are unable to pay such costs, Handy will pay all arbitration fees and expenses. Each party will pay the fees for his/her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law.  The arbitrator will make a decision in writing.  Additionally, the arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement.  However, the preceding sentence shall not apply to the "Class Action Waiver" described in Section d below.

c.  Excluded Disputes.  You and Handy agree that the following Disputes are excluded from this Arbitration Agreement:  (1) any Dispute seeking to enforce or protect, or concerning the validity of, any of your or our intellectual property rights; (2) individual claims in small claims court; (3) any claim that an applicable

3

federal statute expressly states cannot be arbitrated; and (4) any claim for injunctive relief.

<u>See</u> **Exh. 12** (full text of Terms of Use) (emphasis in original).  That arbitration provision also contained a class and collective action waiver, reflected in all capital letters and underlined font:

> d. <u>WAIVER OF RIGHT TO BE A PLAINTIFF OR CLASS MEMBER IN A CLASS ACTION</u>.  You and Handy agree to bring any Dispute in arbitration on an individual basis only, and not as a class or collective action.  There will be no right or authority for any Dispute to be brought, heard or arbitrated as a class or collective action ("**Class Action Waiver**").  Regardless of anything else in this Arbitration Agreement and/or the applicable AAA Rules or AAA Consumer Rules, the interpretation, applicability, enforceability or formation of the Class Action Waiver may only be determined by a court and not an arbitrator.

<u>See id.</u> (full text of the Terms of Use to which Plaintiff agreed on May 5, 2014) (emphasis in original).

> **B.     Plaintiff Again Agreed To Be Bound By An Arbitration Agreement When She First Logged into the Handy App on May 14, 2015.**

8.     After speaking with a Handy employee, Plaintiff was approved as a Professional and attended an orientation.  Pl. Test. at 13-16, 31-32.  Three or four days after the orientation, she downloaded the Handy App on her Android smartphone.  <u>Id.</u>

9.     When Plaintiff first accessed the App, on May 14, 2015, a series of full-page screens appeared on the smartphone screen which required Plaintiff to confirm and accept certain terms to proceed to subsequent screens and use the app.  <u>See</u> **Exh. 10** (screenshots of the recreated Handy App flow reflecting the screens with which Emmanuel was presented on May 14, 2015).

10.     After she logged into the App, the top of the first screen that appeared to Plaintiff read in large, bold text: "**To continue, please confirm that you understand the following:**" <u>Id.</u> Underneath that phrase, there were a handful of bullets in large font, including one that stated that Plaintiff "need[ed] to carefully read the [Agreement] on the following screen . . . ." <u>Id.</u>  To proceed

4

to the next screen, a Professional had to click a large blue button with the word "Confirm" written on it.  K.S. Test.  Plaintiff stipulated at trial that she clicked the "Confirm" button.

11.     After clicking "Confirm," Plaintiff was immediately presented with a screen containing the terms of her use of the Handy platform as a service Professional.  The top of this screen read in large, bold text:  "**To continue, please accept the revised Independent Contractor Agreement.**"  See **Exh. 10**.  Below this statement, Handy's Service Professional Agreement (the "Agreement") was visible on the screen in scrollable text, so that Plaintiff was able to view the beginning of the Agreement, and could scroll down on the screen to view the entire Agreement.  Id.  A large blue button with the word "Accept" is at bottom of the screen.  Id.  Directly following the first full paragraph of the Agreement is the following statement, in all caps:

> BY USING THE HANDY PLATFORM (AS DEFINED BELOW), YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT.  IF YOU DO NOT AGREE TO THE TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT, DO NOT USE THE HANDY PLATFORM.

See **Exhs. 10 & 13** (full text of Agreement containing the same statement in all caps).  A portion of this disclaimer is visible on the screen above the "Accept" button.  **Exh. 10**.  Therefore, even if a Professional chose not to scroll through the entire Agreement, he or she would have viewed the beginning of the Agreement, which contained that language in all caps.  See id.

12.     A Professional could not have continued with the download and registration process and begun using the App without clicking the "Accept" button.  K.S. Test.  Plaintiff stipulated at trial that she clicked the "Accept" button on the bottom of the screen.

13.     Both when a Professional clicked the "Confirm" button and when a Professional electronically accepted the Agreement by clicking the "Accept" button, the Company was notified of the date and time of these events and an electronic record of these events was created

automatically.  Id.  Handy stored, maintained, and relied on these electronic records in the regular course of its business.  Id.  Handy's records showed that, on May 14, 2015, Plaintiff checked the both the "Confirm" button and the "Accept" button.  See **Exh. 11**.

14.    The full text of the Agreement, as of May 14, 2015, is contained in **Exhibit 13** ("terms6").  The Arbitration Provision in the Agreement reads in relevant part as follows:

> 12.2  Mandatory and Exclusive Arbitration. Handy and Service Professional mutually agree to resolve any disputes between them exclusively through final and binding arbitration instead of filing a lawsuit in court. This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16) and shall apply, including but not limited to, to any and all claims arising out of or relating to this Agreement, the Service Professional's classification as an independent contractor, Service Professional's provision of Services under this Agreement, the payments received by Service Professional for providing Services, the termination of this Agreement, and all other aspects of the Service Professional's relationship with Handy, past or present, whether arising under federal, state or local statutory and/or common law.
>
> (a) If either party wishes to initiate arbitration, the initiating party must notify the other party in writing via certified mail, return receipt requested, or hand delivery within the applicable statute of limitations period. This demand for arbitration must include (1) the name and address of the party seeking arbitration, (2) a statement of the legal and factual basis of the claim, and (3) a description of the remedy sought. Any demand for arbitration by Service Professional must be delivered to 33 West 19th Street, 6th Floor, New York, NY 10011[.]
>
> (b) **CLASS ACTION WAIVER – PLEASE READ**. Handy and Service Professional mutually agree that by entering into this agreement to arbitrate, both waive their right to have any dispute or claim brought, heard or arbitrated as a class action, collective action and/or representative action, and an arbitrator shall not have any authority to hear or arbitrate any class, collective or representative action ("**Class Action Waiver**"). Notwithstanding any other clause contained in this Agreement or the AAA Rules, as defined below, any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator.
>
> (c) Service Professional agrees and acknowledges that entering into this arbitration agreement does not change Service Professional's status as an independent contractor in fact and in law, that Service Professional is not an employee of Handy or any Service Requester and that any disputes in this regard shall be subject to arbitration as provided in this agreement.

**Exh. 13** (emphasis in original).

15.     In the Arbitration Provision, Handy also notified Plaintiff of her right to consult with an attorney regarding the dispute resolution provision before accepting the Agreement:

> (g) Right To Consult With An Attorney: Service Professional has the right to consult with private counsel of Service Professional's choice with respect to any aspect of, or any claim that may be subject to, this dispute resolution provision.

<u>Id.</u>

16.     At no point did Plaintiff inform Handy, verbally or in writing, that she was not agreeable to Handy's Terms of Service or the Agreement.  Instead, she utilized the App to obtain cleaning jobs for three to four weeks, four or five days a week, and up to three jobs a day.  Pl. Test. at 34.

## PROPOSED CONCLUSIONS OF LAW

**I.     THE FEDERAL ARBITRATION ACT COMPELS ENFORCEMENT OF ARBITRATION AGREEMENTS.**

17.     Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

18.     The FAA was enacted primarily to "overcome judicial hostility to arbitration agreements," <u>Allied-Bruce Terminix Cos., Inc. v. Dobson</u>, 513 U.S. 265, 272 (1995), and it "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."  <u>Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino</u>, 640 F.3d 471, 474 (1st Cir. 2011) (<u>quoting</u> <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 443 (2006)).

19.     The FAA is designed "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983). To this end, the FAA not only placed arbitration agreements on equal footing with other contracts, but amounts to a "congressional declaration of a liberal federal policy favoring arbitration agreements." Perry v. Thomas, 482 U.S. 483, 489 (1987) (quoting Moses H. Cone, 460 U.S. at 24). As the First Circuit has made clear, "federal law undeniably includes a policy favoring arbitration." PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 148 (1st Cir. 1998) ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration"). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original).

20.     The party seeking to compel arbitration bears the burden of proving that a valid agreement to arbitrate exists, that the movant has a right to enforce it, that the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement. Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16–17 (D. Mass. 2018) (citing Bekele v. Lyft, Inc., 199 F. Supp. 3d 284, 293 (D. Mass. 2016), aff'd, 918 F.3d 181 (1st Cir. 2019)).

21.     Arbitration agreements that are validly formed under state contract law must be enforced except upon such grounds as make the contract unenforceable or where the FAA is precluded by another federal statute's contrary command. Bekele, 199 F. Supp. 3d at 292-93 (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011), CompuCredit Corp. v. Greenwood, 565 U.S. 95, 97 (2012)).

22.     "When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration or compelling the parties to arbitrate and dismissing the action."  Bekele, 199 F. Supp. 3d at 293 (citing 9 U.S.C. §§ 3, 4).

## II.     PLAINTIFF AND HANDY ENTERED INTO A VALID AGREEMENT TO ARBITRATE.

### A.     The Terms of the Agreement Were Reasonably Communicated to Plaintiff.

23.     The first step in deciding whether Plaintiff's claims should be resolved by arbitration is determining "whether . . . there exists a written agreement to arbitrate."  Bekele, 199 F. Supp. 3d at 294 (citing Lenfest v. Verizon Enter. Sols., LLC, 52 F. Supp. 3d 259, 262-63 (D. Mass. 2014)).  For this determination, federal courts generally apply ordinary state-law principles that govern the formation of contracts.  Id.

24.     "Under Massachusetts law, the issue of whether the parties validly entered into an arbitration agreement depends on whether [the] defendant gave some minimal level of notice to the [plaintiff] that statutory claims are subject to arbitration.  Bekele, 199 F. Supp. 3d at 295 (internal citation and punctuation omitted).  "This is an objective test: the sufficiency of the notice turns on whether, under the totality of the circumstances, the [company's] communication would have provided a reasonably prudent [person] notice of the waiver of the right to proceed in a judicial forum."  Id.

25.     A valid arbitration agreement exists here, as Handy communicated and Plaintiff accepted both the Terms of Use and the Agreement, each of which contained a mandatory arbitration provision and class action waiver.

26.     The Terms of Use was presented to Plaintiff in the form of a clickwrap agreement whereby Plaintiff was required to affirmatively indicate her agreement to the Terms of Use before being able to proceed with her registration and submitting her Application.

27.     It is well-settled in Massachusetts that contracts in the form of "clickwrap" agreements are enforceable.  A clickwrap agreement utilizes an "assent process by which a user must click 'I agree,' but not necessarily view the contract to which she is assenting."  Cullinane v. Uber Techs., Inc., 893 F.3d 53, 62 n.10 (1st Cir. 2018) (internal citation omitted).  "Massachusetts courts have routinely concluded that clickwrap agreements – whether they contain arbitration provisions or other contractual terms – provide users with reasonable communication of an agreement's terms."  Bekele, 199 F. Supp. 3d at 295-96; see also Wickberg v. Lyft, Inc., 356 F. Supp. 3d 179, 182-83 (D. Mass. 2018).  "Clickwrap agreements are generally upheld because they require affirmative action on the part of the user."  Small Justice LLC v. Xcentric Ventures LLC, 99 F. Supp. 3d 190, 196 (D. Mass. 2015), aff'd, 873 F.3d 313 (1st Cir. 2017); In re: Daily Fantasy Sports Litig., MDL No. 16-02677-GAO, 2019 WL 6337762, at *10 (D. Mass. Nov. 27, 2019) (slip opinion).  ("[I]t can fairly be said that following a hyperlink is like turning a page in a printed document.  Any reasonable viewer would realize that access to the text of the terms would be simple and immediate.") (internal citation omitted).  The Terms of Use on Handy's website were communicated to Plaintiff on May 5, 2014 in a manner nearly identical to how the underlying agreement containing the arbitration provision was communicated to the plaintiff in Wickberg v. Lyft, Inc., 356 F. Supp. 3d 179 (D. Mass. 2018).  In Wickberg, the plaintiff had to click a checkbox that stated, "I agree to Lyft's [September 30, 2016] terms of services."  Id. at 181.  "The words 'Lyft's terms of services' were highlighted in pink and hyperlinked to the written terms."  Id.  The court held that such display "conforms to what the First Circuit held would be a conspicuous and enforceable agreement.  These online agreements – where a user selects 'I agree' without necessarily reviewing the contract – are typically called 'clickwrap' agreements, and are generally held enforceable."  Id. at 183 (citing Bekele, 199 F. Supp. 3d at 295-96; Ajemian v. Yahoo!, Inc.,

987 N.E.2d 604, 613 (2013); <u>Small Justice LLC</u>, 99 F. Supp. 3d at 196).  The court reached this

conclusion while noting that, while the terms were "without a typical blue-colored hyperlink, the

phrase was pink and [thus] distinguishable."  <u>Wickberg</u>, 356 F. Supp. 3d at 184.  Here, Handy's

Terms of Use *was* a typical blue-colored hyperlink, and thus should have been easily recognizable

as a hyperlink.  <u>See</u> **Exh. 6.**

28.   The Agreement was communicated to Plaintiff in the Handy App on May 14, 2015

(<u>see</u> **Exhibits 10 and 13)** in a manner nearly identical to how the underlying agreement containing

the arbitration provision was communicated to the plaintiff in <u>Bekele v. Lyft, Inc.</u>, 199 F. Supp.

3d 284 (D. Mass. 2016), <u>aff'd</u>, 918 F.3d 181 (1st Cir. 2019).  In <u>Bekele,</u> after a user downloads

and opens the app, the user must agree to Lyft's Terms of Service Agreement.  <u>Id.</u> at 289.   The

text of the agreement appears on the user's screen, and the user can scroll through the entire

agreement if he or she wants.  <u>Id.</u> The user must click the "I accept" button on the bottom of the

screen to begin using the app.  <u>Id.</u>  The image of the screen is displayed in the <u>Bekele</u> decision

(199 F. Supp. 3d at 291), and is nearly identical to the manner in which the screen containing

Handy's Agreement is displayed on the Handy App.  **Exh. 10.**  The <u>Bekele</u> court held that the

agreement was reasonably communicated, explaining:

> Contrary to Bekele's arguments, Lyft's arbitration agreement was not 'buried' on
> another screen or hidden by a hyperlink.  Rather, the entire [agreement], including
> the arbitration provision, was displayed on a user's screen, with prominent bold
> headings.  Moreover, the App allowed users to scroll all the way through the
> [agreement].

<u>Id.</u> at 296-97.

29.   The district court's decision in <u>Bekele</u> was appealed.  918 F.3d 181.  Bekele had

not raised the contract formation issue in his appeal, but argued that the issue should not be deemed

waived because the subsequent issuance of the decision in <u>Cullinane v. Uber Techs., Inc.</u>, 893 F.3d

53 (1st Cir. 2018) constituted a substantial change in the law and amounted to an "exceptional

circumstance" to justify excusing waiver.  In rejecting this argument, the First Circuit Court of Appeal explained that Cullinane had not altered the law, but rather, had applied the same standard that the district court had applied in Bekele.  Bekele, 918 F.3d at 186-87.

30.     Plaintiff's testimony that she did not read through the Agreement is of no moment. Plaintiff admitted that she saw Handy's Agreement in scrollable text when she first accessed Handy's App on her smartphone, and intentionally chose not to read through it.  "Signatories are bound by agreements regardless of whether they actually have read or understood the terms before signifying assent."  In re: Daily Fantasy Sports Litig., 2019 WL 6337762, at *8 (citing Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 44 (1st Cir. 2012)).  The question at hand is not whether the Handy App could have been designed to force a Professional to scroll through the entire Agreement before clicking "Accept," "but whether [the user] had actual or constructive notice that there were terms requiring his assent to which he did give assent."  Id. at *10 (internal citations omitted).  While courts in this Circuit tasked with interpreting Massachusetts law have recognized that there must be "some minimal level of notice" that claims are subject to arbitration, they have "eschewed a 'subjective' notice standard 'which focuses on what the [individual] actually knew' about the arbitration provisions."  Gonzalez v. GE Group Adm'rs, Inc., 321 F. Supp. 2d 165, 169 (D. Mass. 2004) (quoting Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 21 n.17 (1st Cir. 1999)).

31.     Recently, the Cullinane court reaffirmed that the key inquiry is not whether the terms were read, but whether the terms of an agreement were reasonably communicated to the plaintiff.  See 893 F.3d at 62 (when the terms of the agreement are available by following a link, the court must examine the language used to inform users on how to find the terms and whether such communication is reasonable).  Relying on Cullinane, the Wickberg court explained:

> Wickberg also challenges the arbitration agreement on the grounds that he does not remember, nor is there any evidence of him, clicking the hyperlink to view the terms of service.  However, the relevant inquiry is not whether he actually viewed the terms but whether they were reasonably communicated to him.

Wickberg, 356 F. Supp. 3d at 184 n.5.

32.    Here, Plaintiff admits she was aware that there were contractual terms that were to govern her relationship with Handy, but claims that she "chose" not to read the terms.  Beyond the fact that a reasonable person would have noticed the Agreement, it is undisputed that Plaintiff *actually* had notice of it.

33.    Nothing in the Cullinane decision remotely suggests that any particular provision in a contract, such as an arbitration clause, must be "conspicuously" displayed or located in a particular area.  Therefore, Plaintiff is mistaken to the extent she argues that the Arbitration Provision is invalid because one would have to scroll through the Agreement's terms to see it.

34.    Here, Handy's Agreement was prominently displayed to Plaintiff.  Indeed, on May 14, 2015, on the bottom of the "Accept" screen displaying the Agreement – which Plaintiff admits she saw – was the statement, in all capital letters:

> BY USING THE HANDY PLATFORM (AS DEFINED BELOW), YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT.  IF YOU DO NOT AGREE TO THE TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT, DO NOT USE THE HANDY PLATFORM.

**Exhs. 10 and 13** (emphasis in original).

35.    In addition, for any Professional who reviews the Handy Agreement, the mandatory arbitration and class/collective action waivers stand out.  See **Exh. 13**. The Arbitration Provision appears halfway through the Agreement, is set forth in standard font, and is clearly labeled with underlined headings.  Moreover, language contained within the arbitration provision in the Agreement urged the reviewer to "PLEASE READ" that section.  Thus, even if Plaintiff had

casually scrolled through the Agreement, she could not have reasonably missed the arbitration provision.  <u>See, e.g.,</u> <u>Kilgore v. KeyBank, Nat'l Ass'n</u>, 718 F.3d 1052, 1059 (9th Cir 2013); <u>Carter's of New Bedford, Inc. v. Nike, Inc.</u>, No. 13-11513-DPW, 2014 WL 1311750, at *4 (D. Mass. Mar. 31, 2014); <u>Allied Home Mortg. Capital Corp. v. Grant</u>, No. 040505B, 2005 WL 3721194, at *5 n.5 (Mass. Super. Ct. Dec. 6, 2005); <u>Winter Panel Corp. v. Reichhold Chems., Inc.</u>, 823 F. Supp. 963, 973 (D. Mass. 1993).

### B. Plaintiff Assented to Handy's Terms of Use and Agreement.

36.  Plaintiff manifested assent to Handy's Terms of Use on May 5, 2015 and to its Agreement on May 14, 2015, respectively.  <u>See</u> **Exhs. 6-9, 11-13**.

37.  On May 5, 2015, Plaintiff checked the checkbox next to the phrase, "I agree to Handy's Terms of Use."  <u>See</u> **Exhs. 6-9**.  The phrase "Terms of Use" appears in blue to denote a hyperlink that, if clicked, allowed Plaintiff to view the full text of the Terms of Use.  **Exhs. 6-7**. The Terms of Use contained a mandatory arbitration provision.  **Exh. 12**, Sec. 16.

38.  On May 14, 2015, Plaintiff clicked the "Accept" button to manifest her assent to the Agreement, the terms of which were visible in scrollable text on the same screen, and which contained a mandatory arbitration provision.  **Exhs. 10, 11, 13**.

39.  In both the May 5, 2015 Terms of Use and May 14, 2015 Agreement, the Arbitration Provisions require the parties to resolve any disputes between them through final and binding arbitration rather than by filing a lawsuit in court.  **Exh. 12**, Sec. 16(b) **& Exh. 13**, Sec. 12.2(c). The Arbitration Provision in the Agreement makes expressly clear that included within its scope are any disputes concerning Plaintiff's classification as an independent contractor.  **Exh. 13**, Sec. 12.2(c).  Further, that Arbitration Provision goes on to state, "Service Professional is not an employee of Handy or any Service Requester and . . . any disputes in this regard shall be subject to arbitration as provided in this agreement."  **Exh. 13**, Sec. 12.2(c).

14

40.     Against this factual backdrop, Plaintiff entered into a binding agreement with Handy to submit her claims to arbitration.  See Boateng v. Gen. Dynamics Corp., 473 F. Supp. 2d 241, 248-49 (D. Mass. 2007) (valid arbitration agreement existed where plaintiff received and acknowledged agreement); Gonzalez, 321 F. Supp. 2d at 169-70 (arbitration agreement was valid where plaintiff was notified of agreement and signed acknowledgement form indicating he understood its terms); Paradise v. Eagle Creek Software Servs., Inc., 989 F. Supp. 2d 132, 142 (D. Mass. 2013) (plaintiff could not avoid arbitration of his wage claim by arguing he did not read employment agreement containing arbitration provision, as plaintiff outwardly manifested his acceptance of the agreement by signing it and failing to object to any of its terms); see also 15 U.S.C. § 7001(a) (electronic execution of an agreement is valid).

## III.    HANDY IS ENTITLED TO INVOKE THE ARBITRATION AGREEMENT AND PLAINTIFF IS BOUND BY IT.

41.     The Arbitration Provision is expressly mutual, and states that either Plaintiff or Defendant may invoke its provisions.  See Soto v. State Chem. Sales Co. Int'l, Inc., 719 F. Supp. 2d 189, 194 (D.P.R. 2010) (finding that employer was entitled to invoke arbitration agreement because it was a party to agreement); Soto-Alvarez v. Am. Inv. & Mgmt. Co., 561 F. Supp. 2d 228, 231 (D.P.R. 2008) (same).  Because Plaintiff received notice of the Arbitration Provision and electronically accepted it, she is bound by it.  Id.  Accordingly, these two requirements are satisfied.

## IV.    PLAINTIFF'S CLAIMS ARE WITHIN THE SCOPE OF THE ARBITRATION AGREEMENT.

42.     The allegations in the Complaint unquestionably fall within the scope of the Arbitration Provision.  In the Terms of Use, Plaintiff agreed "to resolve any and all Disputes . . . through final and binding arbitration."  **Exh. 12**, Sec. 16(b).  "Dispute" was defined as "any dispute, controversy or claim, past, present or future, between you and Handy, including without limitation any dispute or claim related to or arising out of this Agreement."  Id., Sec. 16(a).

15

43.     In the Agreement of May 14, 2015, Plaintiff agreed to arbitrate "any and all claims arising out of or relating to [the] Agreement," expressly including claims relating to "[Plaintiff's] classification as an independent contractor." **Exh. 13**, Sec. 12.2.  If that were not sufficiently clear, the Arbitration Provision goes on to say that the "Service Professional is not an employee of Handy or any Service Requester and that any disputes in this regard shall be subject to arbitration as provided in this agreement." Id., Sec. 12.2(c).

44.     As this Court has recognized, the presumption in favor of arbitration is "particularly applicable" where, as here, "the arbitration clause at issue is broad in scope" and "provides for arbitration of 'any' kind of controversy pertaining to the contract." Lenfest, 52 F. Supp. 3d at 263. "Under such agreements, parties should be required to submit their disputes to arbitration." Id.

45.     In the Complaint, Plaintiff asserts various claims under the FLSA and Massachusetts wage statutes, all of which are premised on her underlying allegation that she was misclassified as an independent contractor.  Thus, as the dispute concerns Plaintiff's classification as an independent contractor, it unquestionably falls squarely within the scope of the Arbitration Provision.  See, e.g., Paquette v. McDermott Inv. Servs., LLC, No. 14 Civ. 12377, 2014 WL 5313945 (D. Mass. Oct. 17, 2014) (enforcing arbitration provision contained in an independent contractor agreement); Paradise, 989 F. Supp. 2d at 135 (compelling arbitration of wage claim); Discipio v. Anacorp, Inc., 831 F. Supp. 2d 392 (D. Mass. 2011) (compelling arbitration of plaintiff's wage claim pursuant to an employment agreement); Gonzalez, 321 F. Supp. 2d at 170-71 (federal and state labor law claims within the scope of an arbitration agreement that specifically identified employment discrimination claims as arbitrable); see also Moses H. Cone, 460 U.S. at 24-25 ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

16

46.     If this Court were to apply New York law, as the Agreement contemplates, the result would be the same, as New York law on compelling arbitration is nearly identical to Massachusetts law.  New York courts will compel arbitration where a valid arbitration agreement exists and where the parties' dispute falls within the scope of the agreement.  See Transp. Workers Union, Local 252 v. Veolia Transp. Servs., Inc., 24 F. Supp. 3d 223, 227-28 (E.D.N.Y. 2014) ("On a motion to compel arbitration, this Court must first determine whether there is a valid agreement to arbitrate between the parties. The moving party has the initial burden of showing that an agreement to arbitrate exists.  If there is a valid agreement, the Court must then determine whether the particular dispute falls within the scope of the arbitration clause.  If [so], the role of the court ends and the matter is one for arbitration.") (internal citations and quotations omitted); see also Severstal US Holdings, LLC v. RG Steel, LLC, 865 F. Supp. 2d 430, 438 (S.D.N.Y. 2012) ("On a motion to compel arbitration, a court's function . . . is limited to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.") (internal citations and punctuation omitted).

## V.     THE ARBITRATION PROVISION IS NOT UNCONSCIONABLE.

47.     "Under Massachusetts law, an unconscionable contract is one 'such as no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other,'" Storie v. Household Int'l, Inc., No. 03 Civ. 40268, 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005) (quoting Waters v. Min Ltd., 587 N.E.2d 231, 233 (1992)). "Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and *not* to allocation of risk because of 'superior bargaining power.'"  Waters, 587 N.E.2d at 233 (emphasis added, quoting Zapatha v. Dairy Mart, Inc., 408 N.E.2d 1370, 1375-1376 (1980)).

48.     "To show unconscionability under Massachusetts law, [Plaintiff] must prove 'both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise).'" Bekele, 918 F.3d at 187-88, quoting Machado v. System4 LLC, 28 N.E.3d 401, 414 (2015) (emphasis added) (citations and internal quotation marks omitted).

49.     Plaintiff cannot demonstrate that there is anything substantively unconscionable regarding the Arbitration Provision.  Where, as here, "[t]he agreement was bilateral in that either party could invoke its provisions" and "[a]ll rights and remedies available in the courts were preserved for the arbitrator, . . . there is no viable claim of [substantive] unconscionability." Miller v. Cotter, 863 N.E.2d 537, 545 (2007).

50.     Nor is there anything procedurally unconscionable concerning Plaintiff's repeated agreement to arbitrate any disputes she may have with Handy on an individualized basis. Plaintiff's complaint does not suggest any reason why she might have been "unfairly surprised" by the terms to which she agreed: the Arbitration Provision was not "hidden or obscured in a prolix form," nor has Plaintiff alleged that she "had insufficient time to consider the agreement or any other procedural deficienc[ies]." Storie, 2005 WL 3728718, at *9-10.  Rather, as set forth above, Plaintiff assented to arbitrate any claims arising from her relationship with Handy on three separate occasions and, each time, the relevant terms were made abundantly clear.  For example, the Agreement, through emphasis of section heading, alerted Plaintiff that it contained a "Mandatory and Exclusive Arbitration" provision.  **Exh. 13**, Sec. 12.2 (emphasis in original).  See, e.g., Ellerbee, 604 F. Supp. 2d at 355-56 (arbitration agreement not unconscionable where it "was not

hidden, nor was it couched in non-mandatory language that indicated a judicial forum remained open.").

## VI.   PLAINTIFF'S CLASS AND COLLECTIVE ACTION CLAIMS CANNOT PROCEED, AS PLAINTIFF AGREED TO ARBITRATE HER CLAIMS ON AN INDIVIDUAL BASIS.

51.     The Court should further dismiss Plaintiff's class and collective action claims and order the parties to arbitrate Plaintiff's Counts I through III solely on an individual basis because Plaintiff agreed to a class/collective action waiver.  Following the Supreme Court's decision in Epic Systems, there can be no doubt that class action waivers in arbitration agreements are enforceable.  Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1619 (2018) ("In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings."); see also American Exp. Co. v. Italian Colors Rest., 133 S.Ct. 2304, 2309 (2013) ("No contrary congressional command requires us to reject the waiver of class arbitration"); Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681 (2010) (finding that it is improper to force a party into a class proceeding to which it did not agree, because arbitration "is a matter of consent.").  Indeed, the Court has made clear, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." Id. at 684.  Accord Karp v. CIGNA Healthcare, Inc., 882 F. Supp. 2d 199, 206 (D. Mass. 2012) (enforcing class action waiver, citing Stolt-Nielsen; "Class arbitration is thus permissible only if both parties agree.  Put another way, a party cannot be compelled to arbitrate class claims unless something in the contract indicates, at least implicitly, that it agreed to permit class arbitration.").  This holds equally true with respect to an FLSA collective action.  Sutherland v. Ernst & Young LLP, 726 F.3d 290, 296 (2d Cir. 2013) ("every Court of Appeals to have considered [the] issue has concluded that the FLSA does not preclude the waiver of collective action claims.") (collecting cases).

52.     Here, not only is there nothing in the Agreement that permits class or collective arbitration, but the Arbitration Provision contains a valid and unambiguous class action waiver prohibiting class and collective arbitration.  Indeed, the Agreement conspicuously states: "**CLASS ACTION WAIVER—PLEASE READ**.  Handy and Service Professional mutually agree that by entering into this agreement to arbitrate, both waive their right to have any dispute or claim brought, heard or arbitrated as a class action, collective action and/or representative action." **Exh. 13**, Sec. 12.2(b) (emphasis in original).  That paragraph heading is both bolded and capitalized so it is not overlooked, and further emphasizes the section's importance by including the words "**PLEASE READ**."   Accordingly, Plaintiff cannot proceed with her claims on behalf of the putative class either before this Court or in arbitration.  See Schwartz v. CACH, LLC, No. 13 Civ. 12644, 2014 WL 298107, at *2 n.3 (D. Mass. Jan. 27, 2014) (acknowledging validity of class action waiver and refusing to compel class arbitration); Hopkinton Drug, Inc. v. CaremarkPCS, L.L.C., No. 14 Civ. 12794, 2015 WL 57862, at *9 (D. Mass. Jan. 5, 2015) (class action waiver does not render arbitration clause unconscionable); Walthour v. Chipio Windshield Repair, LLC, 745 F.3d 1326, 1335 (11th Cir. 2014) (finding FLSA collective action waiver enforceable) cert. denied, 134 S. Ct. 2886 (2014).

Respectfully submitted,

HANDY TECHNOLOGIES, INC.

By its attorneys,

/s/ Jennifer M. Duke
Michael Mankes (BBO No. 662127)
Jennifer M. Duke (BBO No. 679732)
**LITTLER MENDELSON, P.C.**
One International Place, Suite 2700
Boston, MA  02110
Tel:  617.378.6000
Fax:  617.737.0052
mmankes@littler.com
jduke@littler.com

February 21, 2020

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer M. Duke, hereby certify that on this 21st day of February, 2020, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Jennifer M. Duke_____
Jennifer M. Duke

4832-2338-8596.5 082196.1021