**United States District Court**
**District of Massachusetts**

```
_____    )
                                    )
MAISHA EMMANNUEL,                   )
                                    )
        Plaintiff,                  )
                                    )    Civil Action No.
        v.                          )    15-12914-NMG
                                    )
HANDY TECHNOLOGIES, INC.,           )
                                    )
        Defendant.                  )
_____    )
```

**MEMORANDUM OF DECISION**

**GORTON, J.**

This complaint arises from a wage dispute between Maisha
Emmanuel ("Emmanuel" or "plaintiff") and Handy Technologies,
Inc. ("Handy" or "defendant").  Plaintiff alleges that the
defendant misclassified her as an independent contractor and, as
a result, failed to pay her minimum wage in violation of the
Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and
Massachusetts state law, Mass. Gen. Laws ch. 149, § 148 and
Mass. Gen. Laws ch. 151, § 1.  Emmanuel brings this claim on
behalf of herself and a putative class of similarly situated
individuals.

On Monday, February 10, 2020, the Court presided over a
one-day bench trial limited to the issue of the arbitrability of

- 1 -

plaintiff's claims and now publishes its findings of fact and
conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

### I.   Parties

1.   Handy offers an online platform whereby users can
connect with and request the services of certain professionals
including, but not limited to, cleaners, handypersons, painters
and movers ("service professionals").

2.   Handy does not itself provide the services but rather
provides a technological platform using a mobile software
application ("app") that acts as a marketplace for service
professionals to connect and contract with customers to book
jobs and facilitate payment.

3.   Emmanuel, a service professional, began utilizing
Handy's platform to connect with customers in May, 2015.  She
learned about Handy on www.indeed.com, a website for posting and
applying for jobs.

### II.  Handy's Application Process

4.   In May and June of 2015, to gain access to Handy's
platform as a cleaning service professional, an individual was
required to complete Handy's online Home Cleaner Application

("the Application"), undergo a background check and attend an in-person orientation.

**5.**    On May 4, 2015, Emmanuel accessed Handy's website on a personal computer at Jewish Vocational Services in Boston and completed the Application.

**6.**    The Application asked Emmanuel for the following information: her name, address and phone number; her ability to work legally in the United States; her prior work experience; her availability; how she learned about Handy; her t-shirt size; and whether she had a smart phone, internet access, a car and a bank account.

**7.**    At the bottom of the screen requesting that information, Emmanuel was required to click a checkbox next to the phrase "I agree to Handy's Terms of Use" before proceeding to the next step in the Application process. The phrase "Terms of Use" appeared in blue and contained a hyperlink that allowed, but did not require, Emmanuel to navigate to and review the complete text of Handy's Terms of Use.

**8.**    Handy's website was programmed such that a candidate seeking to apply for a service professional position could not proceed to the next stage of the Application, a knowledge-based

cleaning quiz, without first clicking the checkbox indicating
agreement with the Terms of Use.

**9.**   Emmanuel progressed to the cleaning quiz and, although
she testified that she does not remember doing so, necessarily
clicked the check box indicating her agreement to Handy's Terms
of Use.  Emmanuel did not, however, click the hyperlink to view
the complete text of the Terms of Use.

**10.**   If she had clicked the hyperlink, Emmanuel would have
been presented with a screen that allowed her to scroll through
the full text of the Terms of Use in effect in May, 2015, which
included a mutual mandatory arbitration provision titled "**Mutual
Arbitration Agreement**" in bold and underlined text ("the Terms
of Use Arbitration Provision").  That section, which was toward
the end of the document, also contained a class action waiver
titled, in capitalized and underlined text, "WAIVER OF RIGHT TO
BE A PLAINTIFF OR CLASS MEMBER IN A CLASS ACTION."

**11.**   The Terms of Use Arbitration Provision to which
plaintiff acknowledged her agreement on May 5, 2015, read in
relevant part:

> **Mutual Arbitration Agreement** . . . . b. Arbitration.
> If a dispute is not resolved through Informal
> Negotiations [as defined in subsection 16.a], you and
> Handy agree to resolve any and all Disputes (except
> those Disputes excluded below) through final and
> binding arbitration (**"Arbitration Agreement"**). . . .

    d. <u>WAIVER OF RIGHT TO BE A PLAINTIFF OR CLASS MEMBER IN A CLASS ACTION</u>.  You and Handy agree to bring any Dispute in arbitration on an individual basis only, and not as a class or collective action.  There will be no right or authority for any Dispute to be brought, heard or arbitrated as a class or collective action . . . .

    **12.**   The Terms of Use also contained the following unilateral modification provision ("Unilateral Modification Provision"):

> **<u>Changes to this Agreement</u>**.  We [Handy] reserve the right, at our sole and absolute discretion, to change, modify, add to, supplement or delete any of the terms and conditions of this Agreement at any time, effective with or without prior notice.  If any future changes to this Agreement are unacceptable to you or cause you to no longer be in compliance with the Agreement, you must terminate, and immediately stop using the Handy Platform.  Your continued use of the Handy Platform following any revision to this Agreement constitutes your complete and irrevocable acceptance of any and all such changes.

    **13.**   Shortly after submitting her Application, Emmanuel participated in a brief telephone interview with a representative at Handy's New York headquarters.

    **14.**   The following week, Emmanuel attended an in-person orientation session in Boston.  At that meeting, a Handy representative provided plaintiff and approximately ten other candidates with information about Handy, including how to download Handy's app, order a cleaning kit and begin accepting

jobs.  At no point during that session did Handy's

representative mention arbitration.

### III. <u>Handy's Service Professional Agreement</u>

**15.**   On May 14, 2015, Emmanuel downloaded Handy's app onto

her Samsung smartphone which ran an Android operating system.

**16.**   After the download was complete, Emmanuel accessed

Handy's app using a unique pin number provided to her by Handy.

**17.**    Upon accessing the app, Emmanuel was presented with a

series of screens that required her to confirm and accept

certain terms before proceeding to Handy's platform.

**18.**   The initial screen read, in bold text, **"To continue,**

**please confirm that you understand the following"** five bullet

points:

- I understand and acknowledge that I am a self-employed contractor and not a Handy employee.

- I specifically desire and intend to operate as an independent contractor.

- I understand that I am responsible for all costs and expenses associated with operating as an independent contractor, including with respect to tools, insurance, materials, supplies, and personnel.

- I understand and agree that, if at any time, I believe that my relationship with Handy is something other than an independent contractor, I agree to immediately notify Handy of this view.

- I understand that the Handy Service Professional Agreement has changed and that I need to

carefully read the updated agreement on the
following screen before agreeing to the new
terms.

**19.** Beneath the final bullet point were two clickable
buttons.  The first was a large blue button with the word
"Confirm" appearing in white.  Clicking that button was the only
way for plaintiff to proceed to subsequent screens.  The second
button was a large grey button that read "Click here to return
to portal home and see the newest jobs."  Clicking that button
merely refreshed the app and displayed the same screen.

**20.** After clicking the blue "Confirm" button, plaintiff
was presented with a screen containing the full text of Handy's
Independent Contractor Agreement ("the Services Agreement") in
scrollable format.  The top of the screen read in bold text "**To
continue, please accept the revised Independent Contractor
Agreement**".  The screen also contained the first two paragraphs
of the Services Agreement, the second of which read, in all
capital letters:

> BY USING THE HANDY PLATFORM (AS DEFINED BELOW), YOU
> ARE AGREEING TO BE BOUND BY THE TERMS OF THIS SERVICE
> PROFESSIONAL AGREEMENT. IF YOU DO NOT AGREE TO THE
> TERMS OF THIS SERVICE PROFESSIONAL AGREEMENT, DO NOT
> USE THE PLATFORM.

A portion of that paragraph was obscured by two buttons similar
to those that appeared on the immediately preceding screen
except that the large blue button read "Accept" in white text

- 7 -

rather than "Confirm".  Clicking the "Accept" button provided plaintiff with access to Handy's job posting platform.  As with the previous screen, the other button read "Click here to return to portal home and see the newest jobs" and merely displayed the same screen if clicked.

21.   Plaintiff clicked the "Accept" button but she did not scroll through the full terms of the Services Agreement and, as a result, did not view any reference to arbitration.

22.   If plaintiff had scrolled through the Services Agreement, she would have found a provision toward the end of the document labeled, in underlined text, "<u>Mandatory and Exclusive Arbitration</u>" (the "Services Agreement Arbitration Provision").  That provision also included a subsection labeled, in capitalized and bold text, **"CLASS ACTION WAIVER – PLEASE READ"**.

23.   The Services Agreement Arbitration Provision accepted by plaintiff on May 14, 2015, provides in relevant part:

> <u>Mandatory and Exclusive Arbitration.</u> Handy and Service Professional mutually agree to resolve any disputes between them exclusively through final and binding arbitration instead of filing a lawsuit in court. This arbitration agreement is governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16) and shall apply, including but not limited to, to any and all claims arising out of or relating to this Agreement, the Service Professional's classification as an independent contractor, Service Professional's

provision of Services under this Agreement, the payments received by Service Professional for providing Services, the termination of this Agreement, and all other aspects of the Service Professional's relationship with Handy, past or present, whether arising under federal, state or local statutory and/or common law.

(a) If either party wishes to initiate arbitration, the initiating party must notify the other party in writing via certified mail, return receipt requested, or hand delivery within the applicable statute of limitations period. This demand for arbitration must include (1) the name and address of the party seeking arbitration, (2) a statement of the legal and factual basis of the claim, and (3) a description of the remedy sought. Any demand for arbitration by Service Professional must be delivered to 33 West 19th Street, 6th Floor, New York, NY 10011.

(b) **CLASS ACTION WAIVER—PLEASE READ.** Handy and Service Professional mutually agree that by entering into this agreement to arbitrate, both waive their right to have any dispute or claim brought, heard or arbitrated as a class action, collective action and/or representative action, and an arbitrator shall not have any authority to hear or arbitrate any class, collective or representative action ("Class Action Waiver"). Notwithstanding any other clause contained in this Agreement or the AAA Rules, as defined below, any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator.

(c) Service Professional agrees and acknowledges that entering into this arbitration agreement does not change Service Professional's status as an independent contractor in fact and in law, that Service Professional is not an employee of Handy or any Service Requester and that any disputes in this regard shall be subject to arbitration as provided in this agreement.

**24.** After clicking the "Accept" button, plaintiff was able to access Handy's job posting platform which she did several times thereafter, and she completed between 10 and 20 cleaning jobs for Handy in May, 2015.

**25.** Toward the end of May, 2015, plaintiff decided to stop working for Handy, citing concerns over delayed payment for jobs she had completed. She notified Handy of her concerns and intent to refrain from accepting new jobs at end of May or beginning of June, 2015.

**26.** After deciding that she would no longer book jobs on Handy's platform, plaintiff accessed Handy's App once more on June 4, 2015, to retrieve personal information for her records.

**27.** Upon accessing Handy's App, plaintiff was again presented with a series of screens requiring her to acknowledge that Handy's Services Agreement had been updated ("the Revised Services Agreement").

**28.** The top of the first screen read:

> I understand that the Handy Service Professional Agreement has changed and that I need to carefully read the updated agreement on the following screen before agreeing to its terms.

As with the screens presented to plaintiff when she first accessed Handy's App, Emmanuel was required to click a

button labeled "Confirm" in order to proceed to the next
screen.

29.   After clicking "Confirm", plaintiff was presented with
a second screen that contained the full text of the Revised
Services Agreement in scrollable format.  Plaintiff was not
required to scroll through the text of the Revised Services
Agreement but was required to click a button labeled "Accept" at
the bottom of the screen.

30.   The Revised Services Agreement contained an
arbitration provision identical to the Services Agreement
Arbitration Provision.

31.   Plaintiff clicked the "Accept" button but testified
that she did not intend to accept further jobs from Handy.
Instead, she sought only to retrieve certain information from
Handy's app for her personal records.

32.   In order to access Handy's app and utilize Handy's
platform, plaintiff indicated her affirmative agreement by
either checking a box or clicking a button with respect to three
online contracts: 1) the Terms of Use, 2) the Services Agreement
and 3) the Revised Services Agreement (collectively, "the
Agreements"), each of which contained a mandatory mutual
arbitration provision and a class action waiver.

## CONCLUSIONS OF LAW

### I.   Legal Standard

1.   Pursuant to the Federal Arbitration Act ("FAA"), a written arbitration agreement "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2.  The FAA reflects a "liberal" federal policy in favor of arbitration agreements. AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 340 (2011).  It was designed with the intent to "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible" and to "place arbitration agreements upon the same footing as other contracts." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983); Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974) (internal quotations omitted).

2.   The FAA mandates that a district court "shall direct" arbitration on any issue subject to a valid arbitration agreement. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4).  Conversely, the FAA does not compel arbitration unless the Court is satisfied that there exists a valid agreement to arbitrate. Volt. Info. Scis., Inc. v. Bd. Of Trs. Of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989).

**3.**    The FAA permits a court to invalidate an arbitration provision "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Consequently, arbitration clauses are subject to "generally applicable contract defenses" available under state law. AT&T Mobility, LLC, 563 U.S. at 339-40; see also First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). The parties appear to agree that Massachusetts law applies despite the contemplation of New York law in the Agreements. Massachusetts law is, in any event, virtually identical to New York law with respect to compelling arbitration and the Court will, therefore, proceed with the same underlying assumption of the parties and apply Massachusetts law.

**4.**    The burden of demonstrating that a valid agreement to arbitrate exists lies with the party seeking to compel arbitration. InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003).

II.  **Formation of Agreement to Arbitrate**

**5.**    The formation of online contracts of adhesion is
analyzed in a two-step process. Cullinane v. Uber Techs., Inc.,
893 F.3d 53, 61-62 (1st Cir. 2018).  The initial inquiry is
whether the terms of the contract were "reasonably communicated
to the plaintiff[]" such that they conveyed "[r]easonably
conspicuous notice of the existence of the contract terms." Id.
at 61-62 (quoting Ajemian v. Yahoo!, Inc., 987 N.E.2d 604, 611-
13 (Mass. 2018)).  The second inquiry is whether the plaintiff
"accepted" those terms and, if so, "the manner of acceptance".
Id. at 62.

**6.**    For purposes of determining whether a valid agreement
to arbitrate was formed, the Court need not decide which of the
Agreements is operative.  With respect to the acceptance
inquiry, plaintiff conceded at trial that she acknowledged and
manifested her assent to each of the Agreements, in effect
conceding acceptance. See Boateng v. Gen. Dynamics Corp., 473 F.
Supp. 2d 241, 248-49 (D. Mass. 2007) (holding that manifestation
of assent through acknowledging an agreement is sufficient to
satisfy acceptance).  With respect to the reasonable notice
inquiry, plaintiff was provided reasonable notice of all three
Agreements.

**7.**   As a preliminary matter, the Agreements were provided
to Emmanuel in the form of "clickwrap" agreements.  She was
required to indicate her assent affirmatively to the terms
provided within the Agreements, including the respective
arbitration provisions but was not required to view the full
text of the Agreements. See Cullinane, 893 F.3d at 61 n.10
("Clickwrap refers to the assent process by which a user must
click 'I agree,' but not necessarily view the contract to which
she is assenting" (quoting Berkson v. Gogo LLC, 97 F. Supp. 3d
359, 394-402 (E.D.N.Y. 2015)).

**8.**   Massachusetts courts "routinely conclude[]" that
clickwrap agreements are enforceable and "reasonabl[y]
communicat[e]" an agreement's terms. See, e.g., Bekele v. Lyft,
Inc., 199 F. Supp. 3d 284, 295-96 (D. Mass. 2016) aff'd, 918
F.3d 181 (1st Cir. 2019).  Indeed, under Massachusetts law,
whether a plaintiff had actual notice of the terms of an
agreement is irrelevant so long as the plaintiff was provided
reasonable notice of and an opportunity to review those terms.
Awuah v. Coverall N. America, Inc., 703 F.3d 36, 44 (1st Cir.
2012).

**9.**   In Cullinane v. Uber Technologies Inc., the First
Circuit Court of Appeals held that Uber failed to communicate
reasonably to users of Uber's app its Terms of Service, which

- 15 -

included an arbitration provision. 893 F.3d at 64.  Unlike the
clickwrap agreements at issue here, Uber merely notified users
that, by creating an Uber account, the user was deemed to agree
to Uber's Terms of Service. Id. at 62.  The phrase "Terms of
Service" was displayed in bold white text on a black background
enclosed in a gray rectangle. Id. at 57-58.  If a user clicked
the rectangle, she would be directed to a screen that provided a
link to the full text of Uber's Terms of Service. Id.  A user
was not, however, required to view the full text of the Terms of
Service or even acknowledge the existence of such terms. Id.

   **10.**  In holding that the plaintiffs were not reasonably
notified of Uber's Terms of Service, the First Circuit

> note[d] at the outset that Uber chose not to use a
> common method of conspicuously informing users of the
> existence and location of terms and conditions:
> requiring users to click a box stating that they agree
> to a set of terms, often provided by hyperlink, before
> continuing to the next screen. Instead, Uber chose to
> rely on simply displaying a notice of deemed
> acquiescence and a link to the terms.

Id. at 62.

   **11.**  The First Circuit went on to explain that the
characteristics of the deemed acquiescence notice and the link
to the terms of the agreement were insufficiently conspicuous,
emphasizing that the white, grey and black hyperlink did not
reflect the common appearance of a hyperlink and generally

lacked any distinguishable features. Id. Accordingly, the First Circuit reversed the district court's grant of Uber's motion to compel arbitration. Id. at 64.

12.   Here, in stark contrast, notice of the Agreements was not "indistinguishable" from other features on the screen or "buried inconspicuously". With respect to the Terms of Use, although the hyperlink was provided at the bottom of a page requesting other information and was not underlined, it was displayed in bright blue, a color commonly known to denote a hyperlink. See id. at 63. Furthermore, Handy's program code required plaintiff to check a box indicating her acknowledgement of and agreement with the hyperlinked Terms of Use before allowing her to proceed to any subsequent screens in the application process. See also Bekele, 199 F. Supp. 3d at 296-97 (finding reasonable notice provided for arbitration provision through Lyft's clickwrap presentation).

13.   With respect to both the Services Agreement and the Revised Services Agreement, the full text of each agreement was presented to plaintiff in a scrollable format and plaintiff was required to "accept" the terms presented therein before moving to the next screen. That plaintiff chose not to scroll through and read the text provided to her, including the respective arbitration provisions presented in separate sections with

- 17 -

underlined headings, does not affect whether she was reasonably provided notice of their existence. See, e.g., Awuah, 703 F.3d at 44 ("In Massachusetts courts, it has long been the rule that typically, one who signs a written agreement is bound by its terms whether he reads and understands them or not. Massachusetts law is explicit that it does not impose a special notice requirement upon agreements containing arbitration clauses." (internal citations and quotation marks omitted)).

**14.** Accordingly, Handy has satisfied its burden of demonstrating that Emmanuel had reasonable notice of the Agreements, each of which contained a mandatory mutual arbitration provision.

## III. Unconscionability of Handy's Arbitration Agreement

**15.** An unconscionable contract is one, the "sum total of [which] drives too hard a bargain for a court of conscience to assist." Waters v. Min Ltd., 587 N.E.2d 231, 233 (Mass. 1992) (internal quotations omitted). Unconscionability is determined on a case-by-case basis with focus on whether the challenged provision results in "oppression and unfair surprise to the disadvantaged party". Id. at 233-34.

**16.** To demonstrate unconscionability under Massachusetts law, Emmanuel must demonstrate

<u>both</u> substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise).

<u>Bekele</u>, 918 F.3d at 187-88 (quoting <u>Machado</u> v. <u>System4LLC</u>, 28 N.E.3d 401, 414 (Mass. 2015) (emphasis in original)).

**17.** Procedural unconscionability does not result merely because the Agreements are online contracts of adhesion. <u>See, e.g.</u>, <u>Bekele</u>, 918 F.3d at 184-89. Neither does it result from plaintiff viewing the Agreements on her personal "tiny smartphone screen." Indeed, plaintiff reported no trouble viewing text on that same smartphone screen to navigate Handy's App and ultimately book multiple jobs.

**18.** Plaintiff fails to establish that the circumstances surrounding the formation of the Agreements demonstrate she was provided no meaningful choice and was subject to unfair surprise such that compelling arbitration would be procedurally unconscionable. <u>See id.</u> at 188.

**19.** With respect to substantive unconscionability, the cost-splitting provision of the Terms of Use does not render the agreement unconscionable because Handy represented to the Court that it would

- 19 -

> agree to cover the costs of either mediation or
> arbitration, as both the [Services and Revised
> Services Agreements] and the [American Arbitration
> Association] Commercial Arbitration Rules contemplate
> and permit.

Such an "offer . . . to pay all fees for . . . arbitration

sinks" any argument that the cost splitting provision imposes

prohibitive costs on workers and is substantively

unconscionable. See id. at 189.

   **20.**   The existence of the purportedly unconscionable

Unilateral Modification Clause does not render the Terms of Use

Arbitration Provision unenforceable.  Indeed, it is well settled

that the presence of a single unconscionable term does not

routinely render an entire agreement unenforceable. See Kristian

v. Comcast Corp., 446 F.3d 25, 61-64 (1st Cir. 2006).  If the

Court deemed the Unilateral Modification Clause unconscionable,

which it need not do for purposes of the present dispute, it

could simply sever the offending provision and enforce the

remainder of the Terms of Use, including the arbitration

provision. See, e.g., Booker v. Robert Half Int'l, Inc., 413

F.3d 77, 84-85 (D.C. Cir. 2005) (explaining that striking an

entire agreement is only warranted when "illegality pervades the

arbitration agreement such that only a disintegrated fragment

would remain after hacking away the unenforceable parts").

**21.**   The Terms of Use Arbitration Provision plainly applies to both parties equally.  The mutual exception from arbitration of certain claims, despite speculation that those claims are more likely to be brought on behalf of Handy rather than Emmanuel, does not, therefore, render the provision substantively unconscionable. See Miller v. Cotter, 863 N.E.2d 537, 545 (Mass. 2007) (rejecting an argument of substantive unconscionability where "[t]he agreement was bilateral in that either party could invoke its provisions").

**22.**   The class action waivers in the Terms of Use and Services Agreement Arbitration Provisions are enforceable pursuant to Epic Systems Corp. v. Lewis, 138 S. Ct. 1612, 1624-30 (2018), in which the United States Supreme Court approved of class action waivers in agreements to arbitrate.

**23.**   Plaintiff has failed to demonstrate that either the Terms of Use Arbitration Provision or the Services Agreement Arbitration Provision are substantively unconscionable.

**IV.**   **Scope of Arbitration Provisions**

**24.**   The party seeking to compel arbitration bears the burden of demonstrating that the claims at issue are within the scope of the arbitration agreement. Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16-17 (D. Mass. 2018).

- 21 -

**25.**    The Terms of Use Arbitration Provision and the
Services Agreement Arbitration Provision utilize broad language
to compel arbitration and plainly apply to plaintiff's claims
arising out of the Agreements and challenging her status as an
independent contractor. See Lenfest v. Verizon Enter. Sols.,
LLC, 52 F. Supp. 3d 259, 263 (D. Mass. 2014) ("[A] presumption
[of arbitrability] is particularly applicable where the
arbitration clause at issue is broad in scope, such as where it
provides for arbitration of 'any' kind of controversy pertaining
to the contract.").

                                **ORDER**

    For the foregoing reasons, defendant's motion to compel
arbitration (Docket No. 8) is **ALLOWED**; plaintiff's individual
and putative class claims are **DISMISSED**; and plaintiff is
directed to submit her individual claims to arbitration.



**So ordered.**


                                    /s/ Nathaniel M. Gorton
                                    Nathaniel M. Gorton
                                    United States District Judge




Dated February 27, 2020